## IRON MOUNTAIN OIL. CO. v. EDWARDS et al.

No. 13634—Opinion Filed April 8, 1924.

Rehearing Denied June 17, 1924.

**1. Reformation of Instruments—Erroneous Incorporation of Words — Burden of Proof.**

Where the contention is made by plaintiffs that a certain word was written into and incorporated in a memorandum agreement by fraud or mistake, the burden is upon the plaintiffs to establish such contention.

**2. Contracts—Construction—Intention.**

In construing written instruments the court must place itself, as far as possible, in the position of the parties when the contract was entered into; and consider the instrument itself as drawn, its purpose and the circumstances surrounding the transaction; and, from a consideration of all these elements, determine upon what sense or meaning of the terms used their minds actually met. Withington v. Gypsy Oil Co., 68 Okla. 138, 172 Pac. 634.

**3. Same—Reasonable Construction.**

Where the meaning of the language of a contract is doubtful, and the same is fairly susceptible of two constructions, that construction must be preferred which makes it fair and such as prudent men would naturally execute in preference to a construction that would make the contract inequitable, or such as reasonable men would not be likely to enter into. Withington v. Gypsy Oil Co., 68 Okla. 138, 172 Pac. 634.

**4. Oil and Gas—Action by Lessor to Reform Contract—Judgment not Sustained.**

Record examined, and held, that the instrument in question does not show upon its face that it was the intention of the parties to change and modify an express provision of a contract already in existence between the parties, or that the word "now" after the not maintain the burden placed upon them to show that the purpose and intention of the parties was,to change the express terms of a contract already in existence between the parties, or that the word "now" after word "wells" in the original memorandum of agreement was incorporated therein by fraud or mistake; and held, that the judgment entered for plaintiff W. P. Edwards reforming the instrument was against the decided weight of the evidence and is not supported by the law; and held, that the

judgment for plaintiff W. P. Edwards should be reversed and remanded to the district court of Okmulgee county with directions to dismiss the plaintiff's petition.

(Syllabus by Shackelford, C.)

Commissioners' Opinion, Division No. 4.

Error from District Court, Okmulgee County; Mark L. Bozarth, Judge.

Action by J. A. Edwards and W. P. Edwards, against the Iron Mountain Oil Company, for reformation of a written instrument, and for accounting for royalties on gas wells. Judgment for defendant denying reformation and accounting as to plaintiff J. A. Edwards. Judgment for plaintiff W. P. Edwards against defendant for reformation of instrument and for oil royalties. Defendant appeals from the judgment entered in favor of the plaintiff W. P. Edwards. Reversed, with directions.

Humphrey & Campbell, for plaintiff in error.

Fred M. Carter and C. M. Gordon, for defendants in error.

Opinion by SHACKELFORD, C. The plaintiff in error will be referred to herein as defendant, and the defendants in error as plaintiffs, as they appeared in the trial court.

The plaintiffs commenced this action in the district court of Okmulgee county against the defendant on the 11th of June, 1921. The plaintiffs alleged that they are the owners of a certain tract of land in Okmulgee county on which they had sold an oil and gas lease to one J. H. West, and which lease had been transferred to the defendant. A copy of the original lease is alleged to be attached to the petition. They allege that on the 16th of December, 1914, the defendant induced plaintiffs to sign a stipulation as follows:

"We hereby agree to accept as gas well royalty covering gas sales from the wells on the southwest quarter of sec. 24., twp. 13 N., rng. 14 E. Okmulgee Co. Okla., on which we have an oil and gas mining lease, the equal one-eighth from such gas sales as made by your company to other parties, from and after January 1st, 1915"

—that it was represented by way of inducement to sign the stipulation that the defendant would, after the date fixed, pay one-eighth of all oil and gas produced, as royalty; that since signing the stipulation the word "now" has been added after the word "wells", and that such was a material alteration; that after the stipulation was signed defendant sold large quantities of casinghead gas from producing oil wells, without paying the agreed royalty or rendering any statement, the amount alleged to be $1,000 or $2,000; that about April 19, 1921, the defendant drilled in a gas well which produced 15,000,000 feet of gas per day, from which it sold from two to five million feet per day at ten cents per thousand cubic feet, and has refused to account for the amounts to anywhere from $2,500 to $5,000; that quantities of gasoline have collected in the pipe lines, of which plaintiffs are entitled to one-eighth as their royalty, and no statement has been rendered and no royalty paid, and it amounts to from $250 to $500. The prayer is that the defendant be required to produce the original instrument, and that adding the word "now" after the word "wells" be decreed to be a forgery, and that the instrument be reformed by striking out the word "now"; that defendant be required to account for the casinghead gas sold and gasoline manufactured therefrom, and for judgment for royalty found owing, and that the amount be decreed to be a lien upon the leasehold and equipment, that plaintiffs be decreed the ownership of one-eighth of the gas produced from defendant's gas well; and accounting be had of the amount of royalty determined and for judgment for such amount as may be found owing, and for a lien upon the property; and for a receiver.

The defendant moved to require the plaintiff to attach a copy of the original lease, which, although alleged to be attached, was not, in fact, attached. Plaintiffs withdrew their application for a receiver and by leave of court filed an amended petition. In the amended petition it is alleged that prior to December 16, 1914, defendant had drilled in ten oil wells; that the inducement held out to plaintiffs to sign the stipulation that was signed was that it would have the effect of changing the original terms of the oil and gas lease where it was agreed to pay $250 per annum for gas wells where the gas was marketed, to one-eighth royalty. That J. H. West, agent of the defendant, showed plaintiffs a copy of the stipulation in which the word "now" did not appear after the word "wells", and induced them to sign an apparent copy in which the word "now" did appear after the word "wells"; that the one signed had the effect of limiting the new arrangement to wells already producing, which was not, in fact, the agreement reached; while the copy furnished plaintiffs would have the effect of changing the orig-

inal lease as to all wells that were producing or might thereafter be brought in, which was the agreement reached between the parties. In the prayer in the amended petition it is asked that the court decree that the word "now" was added to and incorporated into the stipulation either by mistake or fraud; and for reformation so as to make the contract express the real intention of the parties. The amended petition and the prayer therein seems to be otherwise the same as the original petition.

After demurrer of the defendant was filed and overruled, the defendant answered, denying the allegations not admitted; and admits that it holds an oil and gas lease upon the property of plaintiffs and is operating thereon; that plaintiffs signed the stipulation referred to on the 16th of December, 1914, and alleged that they went before a notary public and acknowledged it on June 22, 1917, and recites the instrument so signed and acknowledged with the word "now" appearing after the word "wells"; defendant specifically denied that its agents did, or that it represented that it had prepared the stipulation in duplicate; and denies that any false representations, fraud, or artifice was used to induce plaintiffs to sign; the defendant admits that the lease provided for royalty of $250 per annum for gas wells, in the following language:

"If gas only be found in marketable quantities and is marketed, then said second party shall pay to said first parties the sum of Two Hundred Fifty ($250.00) per annum for the production of each and every well, and as long as the same is marketed, payable annually in advance; lessors shall have the free use of gas by making their connections at the well at their own risks and expense, for domestic purposes in one residence on the leased premises, Provided there be surplus gas produced from said premises over and above enough to fully operate the same."

—and alleges that the provision of the lease is still in effect; that the facts with reference to the signing of the stipulation of which complaint is made are about as follows:

"That on said date, wells had been drilled as alleged by the plaintiffs, and that some of the wells, while producing oil, also produced gas, or a product commonly known as 'casinghead gas'; that the original lease contains no provision for the division of this product; and when casinghead gas first appeared in the well there was no market for such product; but later on, and prior to December 16th, 1914, the operator ascertained that the product, or some of it could be sold to parties drilling in the neighborhood of the aforesaid lease; that when such mar-

ket was discovered for said casinghead product, since the parties to the lease had made no provision therein for a division of the product, or for a division of the money received there for; this point was adjusted in the paper made on December 16th, 1914, and said memorandum was limited to the wells then on the premises, and in no wise affects the provision in the lease above quoted, specifying the royalty to be paid on gas wells, as distinguished from wells producing both oil and casinghead gas; and further pleading, the defendant says that in the year 1917, the defendant thought it had found a more permanent market for the casinghead gas produced, and thereupon the instrument of December 16, 1914, was on June 22, 1917, duly acknowledged by the makers thereof, and thereafter placed of record as alleged by the plaintiffs."

Defendant admits that it brought in a gas well in 1921 from which gas was marketed, and alleges it has offered to pay the amount of royalty stipulated in the original lease, but plaintiffs refuse to accept such payments; that defendant now stands ready and willing to pay the royalty on gas wells provided in the lease. Further defendant alleges that it has paid to plaintiffs one-eighth of the proceeds of the casinghead gas from the oil wells. The reply to the plaintiffs is a general denial of all allegations of affirmative defense, and affirmative allegations that the plaintiffs signed the agreement as a modification of the original lease upon the understanding that it was to apply to all oil and gas wells thereafter drilled.

The case was called for trial on the 31st of January, 1922. At the close of the evidence judgment was entered for the defendant denying relief to plaintiff J. A. Edwards. Judgment was rendered against defendant in favor of W. P. Edwards reforming the instrument by striking therefrom the word "now" after the word "wells" and construed the instrument to mean that the defendant by accepting the modification, agreed to a royalty of one-eighth on production from any gas well, and found the defendant owing plaintiff W. P. Edwards the sum of $437.70 as his part of the royalties from the gas well. The defendant appeals from the judgment in favor of the plaintiff W. P. Edwards. The defendant assigns as error: (1) The court erred in overruling defendant's motion for a new trial; (2) the judgment rendered against the defendant in favor of plaintiff W. P. Edwards is contrary to the evidence and the law; (3) that the judgment of the court reforming the contract as between the plaintiff W. P. Edwards and the defendant was against the evidence in the case and contrary to the law appli-

cable thereto; and (4) that the judgment of the court for W. P. Edwards was erroneous when the court had rendered judgment against J. A. Edwards, his coplaintiff.

We find it necessary to examine the first and second assignments of error to properly dispose of this appeal, and will examine them together. For the purpose of getting a clear understanding of this case we desire to get familiar with the facts surrounding the situation of the parties at the time the stipulation over which the contentions herein arose was signed. Plaintiffs were the owners of a tract of land on which they had sold an oil and gas lease to J. H. West, and who had transferred it to the defendant company. A copy of the lease is incorporated in the case-made, and an examination of it shows that the lessors reserved a royalty of one-eighth of the oil produced and a royalty of $250 per annum on each gas well producing marketable quantities of gas, when marketed, but payable in advance. No provision was made in the lease for a division of proceeds from casing head gas, or gas marketed from wells also producing oil. At the time the stipulation was signed the defendant had ten producing oil wells on the lease, and in addition to production of oil some of these wells were also producing gas of the quality referred to as casinghead gas, or wet gas. It seems that for a long time there was no market for that gas, and it was let go to waste. In the latter part of 1914 it was found by the defendant that the casinghead gas might be conserved and sold to other drillers and operators for fuel. The quantity was not great, but was worth sufficient to make the conservation and marketing worth while. These things are not in dispute, but seem to be conceded by all parties. It is also conceded that a gas well producing marketable quantities of gas was brought in in April, 1921. This suit was filed in June, 1921.

The original stipulation signed by the plaintiffs, from which this lawsuit grew, is incorporated into the case-made and is as follows:

"The Iron Mountain Oil Company

"Crude Petroleum
"Tulsa, Oklahoma.

"Morris, Okla., December 16, 1914.

"The Iron Mountain Oil Company,
"Tulsa, Oklahoma.

"Gentlemen: We hereby agreed to accept as gas well royalty, covering gas sales from the wells now on the south-west quarter of sec. 24, twp. 13 N. Rng. 14 E. Okmulgee Co.,

Okla., on which you have an oil and gas mining lease, the equal one-eighth from such gas sales as made by your company to other parties, from and after January 1st, 1915.

"J. A. Edwards.
"W. P. Edwards."

" State of Oklahoma, County of Okmulgee, ss:

"Before me, the undersigned, a notary public in and for said county and state, on this 22 day of June, 1917, personally appeared J. A. Edwards and W. P. Edwards, to me known to be the identical persons who executed the within and foregoing instrument, and acknowledged to me that they executed the same as their free and voluntary act and deed, for the uses and purposes therein set forth."

"R. G. Toomer, Notary Public."

"My commission expires March 4, 1921.
"Seal."

It appears as a letter addressed to defendant by plaintiffs, was written on a typewriter, except the figures indicating the date in December on which it was signed, or the figures "16" which are in ink and made with a pen, and is upon a sheet of defendant's stationery. The original copy which the plaintiffs say was furnished them by defendant is also incorporated into the case-made and is as follows:

"Office of Jarecki Manufacturing Co.,
"St. Louis, Mo.

"Morris, Okla., December____1914.

"The Iron Mountain Oil Company,
"Tulsa, Oklahoma.

"Gentlemen:

"We hereby agree to accept as gas well royalty covering gas sales from the wells on the South-west quarter of sec. 24, twp. 13 N., Rng. 14 E., Okmulgee Co., Okla., on which you have an oil and gas mining lease, the equal one-eighth from such gas sales as made by your company to other parties from and after January 1st, 1915."

This copy was written upon a sheet of stationery of the Jarecki Manufacturing Company with a typewriter, undoubtedly different from the one on which the instrument signed was written. The copy is exactly the same in words as the one signed except the word "now" appearing after the word "well" in the first does not appear in the second, and the figures "16" and the signatures are left off in the copy. There is no apparent change in the one signed. The word "now" after the word "wells" was written in its regular order and shows upon the face of the instrument that no change was ever made after it was written.

The evidence on the part of the plaintiff, as testified to by the plaintiff J. A. Edwards,

tended to prove that J. H. West, an agent of the defendant, came to him and wanted him to agree to change the gas royalty agreement in the original lease from the $250 per annum for each gas well, to a royalty of one-eighth of all gas from any well and plaintiffs agreed to the change; that plaintiff and Mr. West were in the Jarecki supply house and Mr. West sat down and wrote the instrument recited above as a copy and handed it to plaintiff, and when he finished reading it Mr. West had the other in his hand and said it was a copy, but witness did not read the one Mr. West had, but signed it; but would not have signed it had he observed that the word "now" after the word "wells" was in the statement; that he never at any time appeared before a notary public and acknowledged the instrument; that witness did not learn that the word "now" was in the instrument until defendant had sent a check for $250 for royalty on the gas well brought in in April, 1921; that no settlement was ever made with plaintiffs for the casinghead gas that was marketed from the oil wells. On cross examination witness testified that Mr. West wrote the copy given him and then wrote the one which he signed; that West wrote the one signed while witness was reading the other; that there was only two of them written; that settlement was made with witness for royalty on casinghead; witness had forgotten about getting the checks for this royalty; he said when asked about having forgotten receiving the checks, "Yes, sir, I will have to acknowledge I forgot about it like a fool"; there was ten in all of the checks and witness had forgotten about all of them. He also said that if he acknowledged the instrument before Mr. Toomer in 1917 he had forgotten it; that he was in the bank and saw Mr. Toomer nearly every day. The other plaintiff was not present when the instrument was signed by J. A. Edwards. Mr. West talked to him several times about the matter, but he would not sign until he had talked the matter over with J. A. Edwards; that he could not read and understand printed instruments, but relied on his partner J. A. Edwards, but Mr. West told him the change would require defendant to pay royalty of one-eighth of all gas produced; witness (P. W. Edwards) also signed the statement, but never acknowledged it, according to his testimony.

The contention made by the plaintiffs is that the agreement was reached between them and defendant, to change the royalty payment for gas as stated in the original lease at $250 per annum for gas from any well, to one-eighth of the proceeds from gas, whether taken from an oil well producing casinghead gas or from a gas well producing gas alone.

The contentions made on the part of the defendant appear from the testimony of J. H. West. He testified in effect, that at or about the time the instrument was signed defendant had ten oil wells on the Edwards lease producing oil and some of them producing casinghead gas; and that he had found that he could market the casinghead gas to other operators on leases nearby for fuel; but, no provision had been made in the lease for a division of the proceeds derived from the sale of gas from oil wells. That the purpose of the new agreement as embodied in the letter signed by the plaintiffs was to fix a basis for royalty payments on casinghead gas marketed from the oil wells. That at the time the letter was signed there was no gas well on the lease, that is, a well producing gas only; and the gas well was not brought in until in April, 1921; that the instrument signed was prepared in the office of his company at Tulsa; that he did not write it; that he could not operate a typewriter; that he took the letter to J. A. Edwards and they talked over the matter with reference to marketing of the casinghead gas from the oil wells, and J. A. Edwards signed the paper; but he never showed J. A. Edwards a copy or a purported copy of the letter and never represented to either of the plaintiffs that the purpose or effect of the instrument was to change the royalty agreement upon gas wells; that they discussed the effect of the instrument as fixing a basis of division of proceeds from the sale of casinghead gas, or gas produced from the oil wells then on the lease; that after J. A. Edwards had signed the letter he (West) talked with W. P. Edwards about it, and W. P. Edwards refused to sign until he had seen J. A. Edwards, but after he had talked with J. A. Edwards he signed the letter; that defendant marketed casinghead gas from the oil wells and made settlement with the plaintiffs on the basis embodied in the letter. That later on he asked the plaintiffs to acknowledge the instrument and at the suggestion of J. A. Edwards they went before R. G. Toomer, an officer in the bank where J. A. Edwards does his banking business, and both parties acknowledged having signed the instrument; and then it was that plaintiffs or one of them wanted a copy and they went into the office of the Jarecki Manufacturing Company and one of the clerks

made a copy and gave it to J. A. Edwards.

We think that the plaintiffs took the burden of showing that it was the intention of the parties to change the royalty agreement upon gas wells as fixed in the original lease; that the word "now" after the word "wells" was written into the instrument by fraud or mistake. As to the intention of the parties the whole matter depended very largely upon the testimony of J. A Edwards for the plaintiffs and the testimony of J H. West for the defendant. In their testimony was strong conflict, one testifying one way, and the other testifying to a diametrically opposite state of events. So, it becomes necessary to examine the instruments themselves for the purpose of arriving at a just conclusion about where the weight of the evidence offered in the case rests. To arrive at a conclusion that the instrument under consideration was ever intended to change the royalty on gas wells as fixed in the original lease, must be done from testimony outside the instrument itself. And, even if the copy found in the hands of the plaintiffs was the real contract and agreement of the parties, the burden still rests upon the plaintiffs to show that the purpose of the agreement was to change the royalty agreement in the original lease; for no such intention is expressed in this copy. No reference is made to any change of the original lease and there is not one word in the copy that makes reference to royalties from wells to be thereafter drilled, whether oil or gas wells. The language, "We hereby agree to accept as gas well royalty covering gas sales from the wells on the southwest quarter", etc., could not be construed to cover wells to be thereafter drilled without reading something into the language that is not found there. The average English scholar, knowing nothing of the contentions of the parties, would read this language to include wells already drilled upon the lease and not those to be hereafter drilled. The language "from and after January 1st, 1915" could not by any stretch of common understanding of language mean "oil wells on the lease and such as may be drilled after the date fixed." The last phrase in the copy quoted above refers back to royalties. The natural sense of the statement is that "we hereby agree to accept as gas well royalty from and after January 1, 1915, covering gas sales from the wells on the lease", or "we hereby agree (that) from and after January 1. 1915, to accept as gas well royalty covering gas sales from the wells on the lease." That is the natural import of the language used. It does not

appear to contain any ambiguity, but in view of the contentions, let it be admitted that there might be some ambiguity in the language used, then how shall we arrive at what was intended?

In Withington v. Gypsy Oil Co., 68 Okla. 138, 172 Pac. 634, this court said:

"The court must place itself, as far as possible in the position of the parties when the contract was entered into; and consider the instrument itself as drawn, its purpose and the circumstances surrounding the transaction, and, from a consideration of all these elements, determine upon what sense or meaning of the terms used their minds actually met."

Applying the rule here laid down, we will look into the situation of the parties for the purpose of determining what was intended by them. No royalty agreement had been made in the original lease for royalty on casinghead gas, or gas marketed from oil wells. Ten oil wells had been brought in on the lease, and some of them were making casinghead gas, and the manager for defendant company had found that the casinghead gas could be sold to the operators in the community. No gas well had been brought in on the lease, and the lease provided definitely the amount of royalty to be paid on gas wells. The matter of fixing a royalty basis on gas to be marketed from the oil wells on the lease was the thing necessary and the matter about which the oil company wanted an agreement, and the same matter was of interest to the lessors. It was not known at that time that the gas well would ever be brought in on the lease and it was not known that another oil well would be brought in which would also produce casinghead gas in marketable quantities. That being the situation of the parties can it be said that the matter of fixing the royalty basis on gas wells that might be brought in in the future was up for consideration? The oil company already had a lease fixing the royalty on gas wells on a basis advantageous to it as it turned out. A gas well producing marketable quantities of gas, at one-eighth royalty, would pay several dollars per day in royalties. The defendant had a lease providing for the payment of $250 per annum royalty on gas wells. Is it likely that the defendant's manager, who had many years experience in oil and gas operations, had it in mind to change that part of the lease? We think not. On the part of the plaintiffs, they perhaps would have been glad to change the lease from the $250 per annum royalty on gas wells to one-eighth of

the proceeds from gas wells. Mr. J. A. Edwards was a man of education and business ability. Does it seem likely that if an agreement had been reached to change the whole gas royalty agreement, that he would be satisfied with a statement that in no way referred to the terms of the lease that was proposed to be changed, or a statement that in no way indicates on its face that it also includes later wells that might in the future be brought in which would also produce casinghead gas, or gas wells brought in in the future producing marketable quantities of dry gas? We think it not likely that he would have been so satisfied. We think it would have been most natural for Mr. Edwards to have wanted the agreement to refer to the lease and plainly show it was intended to change the terms of the original lease, or at least, show that the new royalty agreement would apply not only to oil wells on the lease, but also to oil and gas wells that might in the future be brought in. We think he would not have been satisfied with a statement that by its plain language only included wells then producing casinghead gas. If the copy had been signed by plaintiffs, instead of the one that was signed, and the matter was before the court for construction as to whether it applied to oil wells then on the lease producing casinghead gas, or whether it also included gas wells that might, in the future, be brought in, the instrument should be construed according to the plain import of the language, that it applied to oil wells then on the lease producing casinghead gas.

In Mann et al. v. Brady, 80 Okla. 299, 196 Pac. 346, this court said:

"Where terms of a written contract are plain and simple, the language is such as to clearly show the intent of the parties thereto, there is no need to apply any technical rules of construction, for where there is no doubt there is no room for construction, and parol testimony is not admissible as an aid to show the intent of the parties."

If the meaning of the language was in doubt, then the rule laid down in Withington v. Gypsy Oil Co., supra, where this court said:

"Where the meaning of the language of a contract is doubtful, and the same is fairly susceptible of two constructions, that construction must be preferred which makes it fair and such as prudent men would naturally execute in preference to a construction that would make it inequitable, or such as reasonable men would not be likely to enter into"

—would be applicable, and the court should not read something into the agreement that was in no wise expressed and make it mean something that prudent men would not naturally enter into and which would render the agreement inequitable. Would a prudent man have been likely to want a change, or agree to a change in a contract from an advantageous condition to one probably much less advantageous? Reasonable and prudent men do not ordinarily make such agreements. We are unable to make the fine distinction contended for by plaintiffs in the two instruments. One has the word "now" after the word "wells" and in the other the word "now" is left out. The plaintiffs contend that the one with the word "now" left out was the real agreement made, and that it means that the defendant was to pay one-eighth royalty on all gas marketed whether from the oil wells on the lease or from gas wells in the future to be brought in. We find ourselves unable to agree that such is a reasonable construction of the copy under the rules laid down. Whether the word "now" after the word "wells" is read into the statement or left out of it, we are constrained to think that the plain import of the language is that it applied to oil wells already on the lease producing casinghead gas.

Certainly the burden was on the plaintiff to show that the copy which they say was the real agreement meant more than that, that is, that it meant to include gas wells that might be brought in in the future, and included the fifteen million foot gas well brought in in 1921.

We have examined all the evidence offered in the case in connection with the instruments themselves, and cannot agree that the plaintiffs have made out their claim by a fair preponderance of the evidence. The court upon consideration of all the evidence found that plaintiff J. A Edwards, who was an educated business man, was not entitled to relief; but defendant W P. Edwards, who was uneducated and not able to read and understand printed matter, was entitled to have the signed instrument reformed by striking ou the word "now" after the word "wells"; and then construed the instrument in his favor, to mean the statement changed the royalty agreement in the original lease, of $250 for gas wells to a royalty of one-eighth of the gas and applied it to the gas well brought in by the defendant in April, 1921, and gave this plaintiff judgment for the sum of $437.70 on this well.

We think, after a careful study of the case, that the finding of the learned trial judge that the word "now" after the word "wells" should be read out of the instrument in favor of the plaintiff W. P. Edwards, was against the decided weight of the evidence. And, we conclude that the construction placed by the learned judge upon the signed instrument after reading out of it the word "now" is not supported by the testimony nor by the law applicable thereto, but is against the decided weight of the evidence and contrary to law.

If the plaintiff J. A. Edwards was not entitled to recover, the defendant W. P. Edwards was not entitled to relief. The plaintiff W. P. Edwards, who was unable to read and understand written or printed instruments relied upon his friends and associate, J. A. Edwards, who was an educated business man. We think the conclusion of the court that plaintiff J. A. Edwards was not entitled to relief was entirely correct. We think the plaintiff W. P. Edwards was also not entitled to any relief. The judgment in his favor was against the decided weight of the evidence.

We find it not necessary to examine the other assignments of error.

We recommend that the judgment of the trial court in favor of plaintiff W. P. Edwards be reversed, with directions to the district court of Okmulgee county to set aside the judgment appealed from and to dismiss the plaintiffs' petition.

By the Court: It is so ordered.