## KONDOS v. STAUFFER.

No. 26639.    June 1, 1937.

186

Chas. L. Yancey, G. C. Spillers, Donald L. Brown, and E. M. Calkin, for plaintiff in error.

R. J. Roberts, for defendant in error.

PER CURIAM. In this case the plaintiff in error, Frank Kondos, sued defendant in error, S. M. Stauffer, in the district court of Oklahoma county, to recover damages alleged to have resulted from breach of a contractual duty of defendant in error to drill an oil well in the town of Asher, Okla. Hereafter the parties will be referred to as they appeared in the trial court.

Plaintiff alleged that on or about June 8, 1929, plaintiff and defendant entered into a written contract by which the plaintiff, for the consideration of $15,000 represented by the transfer to defendant of certain real estate in the city of Sapulpa, purchased 10 units valued at the sum of $10,000, said units amounting to 1/20 undivided interest in the ⅛ of the production, revenue, or profits from an oil and gas lease, including a completed well to be drilled on block 2, Highland addition to the town of Asher, in Pottawatomie county, Okla., and that by said contract defendant accepted the further consideration of $5,000 from plaintiff "in and to another well to be drilled in Oklahoma, and assignment of said interest was to be made to the plaintiff when the final leases had been delivered to the said defendant." Plaintiff attached to his petition copies of two instruments, marked exhibit "A." The first instrument is as follows:

"This agreement made in duplicate this 8 day of June, 1929, between S. M. Stauffer, 407 Perrine Building, Oklahoma City, Okla., of the first part, and Frank Kondos, Seminole, Oklahoma,

"Witnesseth: That in consideration of $5,000 in hand paid, by the party of the second part, the receipt of which is hereby acknowledged, the said party of the first part hereby bargains and agrees to sell to the party of the second part _____ units at $100 per unit, each unit representing a 1/200 undivided interest in ⅛ of the production, revenue or profits from an oil and gas lease, including a completed well to be drilled on block Number Two (2) in Highland addition to the town of Asher, county of Pottawatomie, state of Oklahoma, according to the townsite survey thereof. Certificate of interest to be assigned to purchaser hereof, and title to be held in the name of S. M. Stauffer, net profits from oil, gas or the sale of any part of the above-described lease to be paid the party of the second part, according to the number of units owned therein by the party of the second part.

"All checks, drafts or money orders must be made payable to the order of S. M. Stauffer.

"This contract becomes binding only upon final approval of first party, at which time certificate of assignment will be made.

"Witness our hands and seals at Seminole, Okla. this 8 day of June, 1929.

"S. M. Stauffer, First party.
"Frank Kondos, Second party."
"S. M. Stauffer, Representative."

The second instrument is in the following words:

"This agreement, made in duplicate this eighth day of June, 1929, by and between S. M. Stauffer, of Oklahoma City, Oklahoma, party of the first part, and Frank Kondos of Tulsa, Oklahoma, party of the second part,

"Witnesseth: That in consideration of five thousand dollars ($5,000) in hand paid by party of the second part, the receipt of which is hereby acknowledged, the said party of the first part hereby bargains and agrees to sell to the party of the second part fifty units at one hundred dollars ($100) each, and that each unit represents a one-two-hundredth (1/200) interest (undivided) in one-eighth (⅛) of the production, revenue or profits from an oil and gas lease, including a completed well to be drilled on block number 2, Highland addition, to the town of Asher, Oklahoma, without further cost to said party of the second part.

"It is further understood and agreed that said party of the second part is to receive a $5,000 interest in and to another well to be drilled in Oklahoma, and an assignment to same is to be issued and delivered to the

said party of the second part to such interest when final leases have been delivered to said party of the first part.

"It is further understood and agreed that said party of the second part is to receive a further assignment of a $5,000 interest in and to such other block as may be approved and acceptable to him.

"It is agreed that all of the above acreage shall be held and operated without any further cost to party of the second part, and that he may 'assign, sell or convey any part or all of such interest when final assignments are made to him.

"Said party of the second part shall have the right to select 'any interest up to fifteen thousand dollars ($15,000) as heretofore set out, in and to such blocks of leases as are to be drilled by said party of the first part.

"Witness our hands on the day first above written.

"S. M. Stauffer,
"Party of the first part.

"Frank Kondos,
"Party of the second part."

Plaintiff further alleged that he executed the deed to the Sapulpa property, in accordance with the agreement between the parties, and that that conveyance was delivered to defendant; he alleged the failure of defendant to drill the well which he agreed to drill in the town of Asher; that the cost of drilling a well in the Asher pool would be $50,000; and prayed for damages in that amount.

Defendant's answer was: (1) A general denial; (2) a specific denial of the execution of the contract alleged in plaintiff's petition; (3) that defendant received no consideration for the instrument mentioned in plaintiff's petition, and that the same was obtained by fraud in that plaintiff fraudulently represented the Sapulpa property to have a reasonable market value of $20,000 and that it would sell for $15,000; that an investigation of said property was made and defendant found that said property had no value above the existing indebtedness, which was more than $5,000; that defendant notified plaintiff that he would not accept said property for that the same was not as represented, and that defendant refused to accept a deed to said property.

Upon these issues the case went to trial. At the conclusion of plaintiff's evidence defendant demurred thereto. In sustaining the demurrer, the trial judge stated:

"The demurrer of the defendant is sustained by reason of the fact that under the court's interpretation of the contracts, the same is not a drilling contract nor a contract to drill a well; that the testimony does not show that the plaintiff upon completion of the contract would have received or been entitled to receive 'a completed well, or any part thereof. That is the reason for sustaining the demurrer. Mr. Brown: I have fault with your Honor's statement that on the statement of the evidence he was not to receive a well or any part thereof, for the reason that is purely a question of interpretation of this contract, as to whether he was or was not. The Court: What I am referring to is the contract itself being in evidence. Mr. Brown: To which ruling of the court the plaintiff excepts. The Court: When I used the words not shown by the evidence, I mean not shown by the contract that is introduced in evidence, and basing the decision of the court entirely upon the court's interpretation of the contract, irrespective of other evidence in the case."

The present appeal is from the order sustaining the demurrer interposed by defendant. For reversal, plaintiff contends, in effect, that:

(1) Under such a contract as existed between the parties, the same "is not performed when the seller fails to deliver recordable instruments transferring to the buyer the property described or fails to drill the well referred to in said contract."

(2) The measure of damages for the failure to drill a well is the reasonable cost of drilling the same.

(3) "If the defendant had no intention at the time of accepting a deed to the plaintiff's property of drilling a completed well on the property described in the contract, then he was most certainly guilty of fraud and made misrepresentations to the plaintiff to induce him to part with his property. * * * If these statements were false, then the plaintiff is entitled to either affirm or disaffirm the contract. If he affirms the same, he is entitled to recover damages occasioned by the defendant's fraud. If he disaffirms the contract he is entitled to recover back from the defendant all property he parted with in reliance upon said statements."

For affirmance of the order sustaining defendant's demurrer, defendant contends:

(1.) That "a contract containing a provision that: 'Party of the first part, in consideration of $5,000, bargains and agrees to sell to party of the second part 50 units at $100 each, and that each unit represents a 1/200 interest (undivided) in ⅛ of the

production, revenue or profits from an oil and gas lease, including a completed well to be drilled on block 2 * * * without further cost to said party of the second part,' where such provision is construed with other provisions of same contract which show clearly that purchaser would not be entitled to receive an oil and gas well or any part thereof, had such well been drilled, is not a contract obligating the seller to drill an oil and gas well."

(2) That "plaintiff's evidence was wholly insufficient to sustain any verdict the jury might have returned against the defendant."

(3) "A party framing the issues and trying his case on a certain theory will not be permitted to change his theory on appeal"; and that plaintiff "presents the question of breach of a contract of sale" and that the same "is not germane to the issue of breach of a contract to drill a well," which was the theory of plaintiff in his pleading and by his evidence introduced in the trial.

At the outset of our discussion of the questions involved, we lay aside the question sought to be raised by plaintiff's proposition No. 3, mentioned above, because of the rule of law, upon appeals to this court, that "parties will not be permitted to prevail in the Supreme Court on issues not raised in the trial court." Herbert v. Wagg, 27 Okla. 674, 117 P. 209. Plaintiff's suit was not for rescission upon the ground of fraud, but was a reliance upon the contract and for damages for breach. In this case, according to the pleadings and the opening statements of counsel, it appears that the defendant was the person claiming fraud and right to be relieved from the contract because of fraudulent representations. We will proceed to consider the questions raised by the plaintiff's petition and the evidence introduced; they are the only questions which were involved in ruling on the demurrer to plaintiff's evidence.

The first question which must be determined is whether the two instruments above quoted constitute one contract between the parties, whether they were executed on different dates, or whether one of the instruments was intended to be, and is a substitute for the other. The first instrument was introduced as exhibit 1; it bears date of June 8, 1929; bears the following statement: "Witness our hand and seals at Seminole, Okla." While the second instrument, introduced as exhibit 2, bears the same date as exhibit 1, it appears from plaintiff's testimony that it was executed at Tulsa, and according to plaintiff's testimony was prepared by defendant at a hotel in Tulsa. Unfortunately the plaintiff's testimony on the question of the time of the execution of exhibits 1 and 2 is not definite. We do think, however, that it is susceptible of the construction that the instruments were executed at different times and at different places. In brief, on behalf of plaintiff, counsel take the position that one contract was a substitute for the other. This conclusion is consistent with the opening statement of counsel for defendant, wherein counsel referred to the negotiations between the parties and that:

"They did sign the contract which will be in evidence here, which provided for the sum of $5,000 to be paid by Mr. Kondos to Mr. Stauffer, but there was no cash; it was all in that property. Then after that happened—that was on the 8th day of June, 1929,—they made an appointment for a later date, that Mr. Stauffer would go from his office in Oklahoma City to Seminole and pick up Mr. Kondos and they would go and inspect this property and complete the deal. **This first contract had already been made.** * * * When he got to Seminole from his office in Oklahoma City, on the 10th day of June, 1929, prepared to go to Sapulpa and inspect this property to complete the deal, Mr. Kondos met him in Seminole, and said 'Say, this contract here only calls for $5,000 investment. I wanted to invest more money. You take my property while there is a big equity there, $5,000. I don't want to do that. My property is worth $15,000; you can get $15,000 from it, and therefore I want to be protected on this other $10,000 that you are getting the value of from me.'"

We feel quite sure that this statement of counsel as to the execution of two separate instruments, by the same parties but at different times, is in accordance with the testimony of the plaintiff, even though that testimony is not as definite upon this important question as it might have been. But there are other reasons clearly indicating that exhibit 2 was a substitute for exhibit 1. Plaintiff testified he told defendant that the Sapulpa property was worth $20,000; the deed executed by plaintiff to defendant carries a covenant that the property is free from liens, etc., except a mortgage and taxes not to exceed $5,000. If the value was $20,000 and incumbrances amounted to $5,000, the net value would be $15,000. In discussion of the first paragraph of exhibit 2, counsel for the defendant says:

"There follows two consecutive para-

graphs in which it is provided that plaintiff purchases separate $5,000 interests in other separate leases which taken with the $5,000 interest in the Asher lease makes up the $15,000 estimated value plaintiff placed upon the Sapulpa property."

Upon its face exhibit 1 provides for the sale of units valued at $5,000. Exhibit 2 provides for the sale of units valued at $5,000, and in addition it provides for $10,000 interests in other properties. If the two instruments should both be construed as the sale of different interests, the total value of the several interests sold would aggregate $20,000 instead of $15,000, the agreed value of the Sapulpa property. For this reason, we conclude that the first part of exhibit 2 deals with the identical interests mentioned in exhibit 1, and that since exhibit 2 was executed later than exhibit 1 and deals with not only the same property as is mentioned in exhibit 1, but interests in other properties, exhibit 2 controls the question now under consideration. Even if the contracts were between the same parties and executed on the same day, the court would have the right to presume such priority in execution as should best effect the intention of the parties. 6 R. C. L. par. 240; Newall v. Wright (Mass.) 3 Am. Dec. 98.

Now, what did the parties intend by their written contract? Counsel for both parties resort to many rules fixed by the statutes and judicial decisions for guidance in endeavoring to arrive at the intention of the parties in the execution of contracts.

In the first place, the court should place itself, so far as possible, in the position of the parties, and consider the instrument as drawn, the circumstances surrounding the transaction, the purpose in view, and determine the meaning of the words used, so as to carry into effect the intention of the parties. Prowant v. Sealy, 77 Okla. 244, 187 P. 235. In this case it was held that:

"Where a contract is ambiguous, the true intention of the parties, if it can be ascertained therefrom, prevails over verbal inaccuracies, inapt expressions, and the dry words of the stipulation."

Exhibits 1 and 2 were introduced in evidence and were read to the jury. Then the plaintiff testified:

"Q. Now, Mr. Kondos, was there anything said about how deep this well was to be drilled? A. Yes. sir; he said he go about 4.000 feet to the Wilcox sand. Q. Did you go out after the delivery of these contracts, after you and your wife had signed them,

and look the drilling site over? Where he was going to drill this well, did you go out to where he was going to drill it? A. I had been before; I saw the well and the derrick already started. Q. He took you out and showed you where he was going to drill? A. Yes. sir. And he already had the derrick done? A. Yes, sir, and he said he going to start to drill. Q. That is where he told you he was going to drill this well? A. Yes, sir. Q. Did he ever do any drilling? A. No, sir."

This testimony is consistent with the opening statement of counsel for defendant wherein he stated that plaintiff "wanted to go and see where this oil well was being drilled. Mr. Stauffer took him in his car and took him over. Mr. Stauffer had the derrick built and a string of tools was being rebuilt at that time. I think that will be the evidence on that point. They came back to Seminole from that trip and Mr. Kondos wanted to complete the transaction. He was satisfied that the proposition was all right. He saw the derrick and saw the rig being moved in to drill the well and he was satisfied."

Under these admitted facts, what did the parties mean when they signed the contract whereby defendant sold to plaintiff certain units, each representing an undivided interest in one-eighth of the "production, revenue or profits from an oil and gas lease, including a completed well to be drilled on block No. 2, Highland addition, to the town of Asher, Okla., without further cost to said party of the second part"? There could be no production from the lease unless oil or gas was discovered; there could be no purpose in showing plaintiff the location of the well and that the derrick was also there, unless the purpose was to indicate to the plaintiff that defendant was then actually engaged in efforts to develop the lease. What would the reason be for advising plaintiff that he, defendant, would drill the well to the Wilcox sand unless he intended that plaintiff should understand his fixed intention to drill upon the lease and thereby furnish "production" out of which plaintiff was to secure a portion?

Under the terms of the first part of the contract, preceding the words, "including a completed well to be drilled," no absolute duty was imposed upon defendant to drill. What is the significance of the words quoted? The word "including" in our opinion means that plaintiff was buying something in addition to the interests and rights previously described in the contract. That additional interest or property was the

right to receive his proportionate part of profits from a lease with a well on it. The words, "to be drilled," do not mean at some future time, nor do they mean to leave the question of drilling or not drilling optional with defendant, when used in this contract. That is true because the parties dealt with a then existing condition; the well was already located, the rig was up, defendant stated he was going to start. The words used must not be disassociated from the circumstances surrounding the execution of the contract. The conclusion we have reached is supported by the decision of this court in Gem Oil Co. v. Callendar, 70 Okla. 214, 173 P. 820. In that case the action was for damages for breach of a contract. The parties had agreed that, for services rendered by plaintiff, he was to be paid certain sums of money and "the further sum of three thousand dollars ($3,000) when and if a well proposed to be drilled by first party (defendant) on any of its present leases in sections 14 or 15, township 20 north, range 13 east, is drilled in and proves a commercially paying oil or gas well." The defendant sold the leases and did not drill the well proposed to be drilled; other persons thereafter drilled a well. The question involved was whether the contract imposed an obligation to drill. Upon that question, this court held:

"The word 'proposed' in a binding contract for the payment of $3,000 'if a well proposed to be drilled upon certain land proves a commercially paying oil or gas well,' must, in construing such contract, be defined as fixed intention on the part of the promisor fully known to the promisee at the time the contract was entered into that a well was contracted to be drilled upon the land referred to in the contract."

That the parties intended that plaintiff should have an interest in a completed well is further shown by the second paragraph of exhibit 2. That instrument provides that plaintiff was to receive a $5,000 interest "in and to **another** well to be drilled in Oklahoma." There could not be "another well" unless the parties had already provided for the. drilling of a well.

Could there be any question, in view of the facts and circumstances surrounding the execution of the contract, that plaintiff understood that defendant intended to drill to the Wilcox sand, as he stated he would? If there be ambiguity, the interpretation must be as the promisor believed the promisee understood it. Section 9473, C. O. S. 1931.

If the words used give right to ambiguity, the contract should be construed less favor-

ably to the party using ambiguous terms in the contract. Smith v. First National Bank, 167 Okla. 408, 29 P. (2d) 971; section 9478, C. O. S. 1931. Plaintiff testified that defendant prepared the contract.

According to the plaintiff's testimony, he was paying $5,000 for 50/200 interest in ⅛ of the production, etc., from the lease. At that rate the ⅛ would be worth $20,000. If the contract is susceptible of two constructions, the court should adopt that construction which is fair and such as prudent men would naturally intend by the use of the words employed by the parties in the contract. Iron Mountain Oil Co. v. Edwards, 100 Okla. 4, 227 P. 150. Would a prudent man pay $5,000 for one-fourth interest in ⅛ of the production, etc., from town lots if there is no production upon the property and no obligation upon the seller to drill?

Bearing in mind the evidence in the case, the contract as written, the facts and circumstances surrounding its execution, the language used in the contract, we conclude that by said contract defendant as a part of his engagement with plaintiff obligated himself to drill the well to the Wilcox sand, and that by his failure to do so, he breached his contract, and is liable to plaintiff for damages, unless, of course, the defendant is entitled to be relieved from his contractual duty by reason of the facts set forth in his answer, or otherwise. We are dealing here solely with questions arising upon the pleadings and plaintiff's evidence. It is our opinion that the contract, construed in the light of the facts and circumstances surrounding its execution, imposed upon the defendant the absolute duty to drill the well, and that for breach of that duty defendant is liable to the plaintiff.

From the conclusions reached, it necessarily follows that the order sustaining defendant's demurrer to plaintiff's evidence and the order overruling the motion for new trial should be reversed, and a new trial granted.

The Supreme Court acknowledges the aid of Attorneys C. J. Davenport, F. A. Speakman, and J. E. Thrift in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Davenport and approved by Mr. Speakman and Mr. Thrift, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration, this opinion was modified and adopted.

OSBORN, C. J., BAYLESS, V. C. J., and RILEY, BUSBY, and HURST, JJ., concur. PHELPS and GIBSON, JJ., dissent. WELCH, J., absent.